**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re Apollo Global Management, Inc. and Apollo Management Holdings, L.P. Data Breach Litigation* | Master File No. 1:26-cv-07223-AKH<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiffs Henggao Cai, Donna Paris, and Tiffany Farrugia ("Plaintiffs"), by and through undersigned counsel, on behalf of themselves and all others similarly situated ("Class Members"), allege the following Consolidated Class Action Complaint (the "Action") against Defendants Apollo Global Management, Inc. ("AGM") and Apollo Management Holdings, L.P. ("AMH", collectively with AGM, the "Defendants") upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel as follows:

## I. SUMMARY

1. Plaintiffs bring this Action on behalf of themselves and all other similarly situated victims as a result of a recent cyberattack and data breach involving personally identifiable information ("PII" or "Private Information") suffered by Defendants, which Defendants experienced between July 6 and July 10, 2026 (the "Data Breach").

2. As alleged herein, a data-theft organization needed nothing more than a phone call to infiltrate Defendants' systems. Indeed, the Data Breach began when the group contacted Defendants' employees, who simply granted it access, allowing the dangerous data-theft organization to ***steal*** Plaintiffs' and Class Members' highly sensitive Private Information.

3. AGM is a New York-based leading global alternative asset manager that raises, invests, and manages capital for institutional and individual investors across credit and equity

strategies.[1] AGM, together with its consolidated subsidiaries, is known as "Apollo", a large public money management firm handling hundreds of billions of dollars for its clients.[2]

4. AMH is a New York-based investment-management limited partnership that manages and advises investment funds and accounts as part of the broader Apollo corporate group's asset-management business. AMH is an indirect subsidiary of AGM.[3]

5. Plaintiffs and individuals impacted by the Data Breach provided their Private Information to Defendants in connection with the services and/or employment Defendants provide.

6. Recently, Defendants became aware that certain systems on their network environment were affected by a data breach and subsequently launched an investigation into the matter. The investigation determined that there was unauthorized access to Defendants' systems between July 6 and July 10, 2026, and that files containing Private Information were accessed without authorization.[4]

7. On or about August 21, 2026, Defendants began sending individualized Notice of Data Breach letters in connection with the Data Breach, informing victims that their Private Information had been exfiltrated from Defendants' network and systems ("Notice").[5]

---

[1] https://www.apollo.com/aboutus (last visited Oct. 19, 2026).

[2] *See* https://ir.apollo.com/news-events/press-releases/detail/604/apollo-reports-fourth-quarter-and-full-year-2025-results (last visited Oct. 19, 2026) ("2025 highlights include record origination activity exceeding $300 billion and inflows of more than $225 billion").

[3] *See* Defendant AGM's 2025 Form 10-K submitted to the SEC, identifying Defendant AMH as an indirect subsidiary, accessible at: https://ir.apollo.com/sec-filings/content/0001858681-26-000013/apo-20251231.htm (last visited Oct. 19, 2026).

[4] *See* Defendants' sample notice submitted to the California Office of the Attorney General, accessible at: https://oag.ca.gov/system/files/L01%20Template_CA.pdf (last visited Oct. 19, 2026).

[5] *Id*.

8. The following types of Private Information were compromised as a result of the Data Breach: names, dates of birth, contact information, home addresses, and Social Security numbers.[6]

9. Alarmingly, Plaintiffs' and Class Members' Private Information was ***stolen*** and has likely already been posted to the dark web because the Data Breach, upon information and belief, is part of a campaign conducted by a cybercrime group tracked as "UNC6671"[7] (f/k/a "BlackFile"), which is notorious extortion group targeting the financial services, private equity, and professional services sectors.[8]

10. Defendants failed to adequately protect Plaintiffs' and Class Members' Private Information–and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted Private Information was compromised due to Defendants' negligent and/or careless acts and omissions and their utter failure to protect individuals' sensitive data. Hackers targeted and obtained Plaintiffs' and Class Members' Private Information because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

11. As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiffs' and Class Members' Private Information was accessed and disclosed. This action seeks to remedy these failings and their consequences.

---

[6] *Id.*

[7] Eduard Kovacs, *Personal Information Exposed in Apollo Global Data Breach*, SecurityWeek (Aug. 24, 2026), https://www.securityweek.com/personal-information-exposed-in-apollo-global-data-breach/ (last visited Oct. 19, 2026).

[8] Ionut Arghire, *Vishing Extortion Group UNC6671 Rebrands After Making Millions*, Security Week (Aug. 7, 2026), https://www.securityweek.com/vishing-extortion-group-unc6671-rebrands-after-making-millions/ (last visited Oct. 19, 2026).

Plaintiffs bring this action on behalf of themselves and all persons whose Private Information was exposed as a result of the Data Breach.

12. Upon information and belief, Plaintiffs' Private Information is available on the dark web as a result of the Data Breach.

13. Plaintiffs bring this action on behalf of all persons whose Private Information was compromised as a result of Defendants' failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendants' inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendants' conduct amounts at least to negligence and violates federal and state statutes.

14. Defendants disregarded the rights of Plaintiffs and Class Members by (a) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that their network servers were protected against unauthorized intrusions; (b) failing to disclose that they did not have adequately robust security protocols and training practices in place to safeguard Plaintiffs' and Class Members' Private Information; (c) failing to take standard and reasonably available steps to prevent the Data Breach; (d) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (e) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

15. Plaintiffs and Class Members have suffered injury as a result of Defendants' conduct. These injuries include: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the

bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

16. Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

17. Accordingly, Plaintiffs bring this action against Defendants seeking redress for their unlawful conduct and asserting claims for: (i) negligence and negligence *per se*, (ii) breach of implied contract, and (iii) unjust enrichment.

18. Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendants' data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendants, and declaratory relief.

## II. JURISDICTION AND VENUE

19. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1332(d), as provided by the Class Action Fairness Act, because: this is a civil action filed under Rule 23 of the Federal Rules of Civil Procedure; the amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class consists of more than 100 members; and at least one member of the Class is a citizen of a state different from Defendants, namely, Plaintiffs, citizens of New Jersey.

20. For purposes of assessing diversity under CAFA, an unincorporated association — including a limited partnership — is deemed a citizen of the state under whose laws it is organized and the state where it maintains its principal place of business. 28 U.S.C. § 1332(d)(10). Defendant AMH is organized under the laws of Delaware and maintains its principal place of business at 9 West 57th Street, New York, NY 10019. Accordingly, Defendant AMH is a citizen of Delaware and New York for CAFA purposes, and minimal diversity exists because Plaintiffs are citizens of New Jersey.

21. This Court has personal jurisdiction over Defendants because Defendants maintain their principal place of business within this District, because Defendants reside in and regularly transact business in the State of New York, and because a substantial part of the events, omissions, and acts giving rise to this Action occurred in the State of New York.

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants reside in this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III. PARTIES

***Plaintiffs***

23. Plaintiff Henggao Cai is an individual citizen and resident of New Jersey.

24. Plaintiff Donna Paris is an individual citizen and resident of New Jersey.

25. Plaintiff Tiffany Farrugia is an individual citizen and resident of New Jersey.

***Defendants***

26. Defendant AGM is a corporation organized under the laws of the State of Delaware, maintaining its principal place of business at 9 West 57th Street, New York, NY 10019.

27. Defendant AMH is a limited partnership organized under the laws of the State of Delaware, maintaining its principal place of business at 9 West 57th Street, New York, NY 10019.

## IV. FACTUAL ALLEGATIONS

***Defendants' Business***

28. AGM is a New York-based leading global alternative asset manager that raises, invests, and manages capital for institutional and individual investors across credit and equity strategies.[9] AGM, together with its consolidated subsidiaries, is known as "Apollo", a large public money management firm handling hundreds of billions of dollars for its clients.[10]

29. AMH is a New York-based investment-management limited partnership that manages and advises investment funds and accounts as part of the broader Apollo corporate group's asset-management business. AMH is an indirect subsidiary of AGM.[11]

30. Defendants collect personally identifiable information in the course of doing business. This personally identifiable information includes the Private Information of Plaintiffs and Class Members which was compromised in the Data Breach alleged herein. But for Defendants' collection of Plaintiffs' and Class Members' Private Information, Defendants would be unable to provide their services.

[9] https://www.apollo.com/aboutus (last visited Oct. 19, 2026).

[10] *See* https://ir.apollo.com/news-events/press-releases/detail/604/apollo-reports-fourth-quarter-and-full-year-2025-results (last visited Oct. 19, 2026) ("2025 highlights include record origination activity exceeding $300 billion and inflows of more than $225 billion").

[11] *See* Defendant AGM's 2025 Form 10-K submitted to the SEC, identifying Defendant AMH as an indirect subsidiary, accessible at: https://ir.apollo.com/sec-filings/content/0001858681-26-000013/apo-20251231.htm (last visited Oct. 19, 2026).

31. Upon information and belief, and through their privacy policy ("Privacy Policy"),[12] Defendants promise to maintain the confidentiality of Plaintiffs' and Class Members' Private Information to ensure compliance with federal and state laws and regulations, and not to use or disclose Plaintiffs' and Class Members' Private Information for non-essential purposes.

32. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

33. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiffs and Class Members would not have entrusted Defendants with their Private Information had they known that Defendants would fail to implement industry standard protections for that sensitive information.

34. Plaintiffs and the Class Members relied on Defendants to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***The Attack and Data Breach***

35. Recently, Defendants became aware that certain systems on their network environment were affected by a data breach, and subsequently launched an investigation into the matter. The investigation determined that there was unauthorized access to Defendants' systems

[12] https://www.apollo.com/governance/privacy-policy.html (last visited Oct. 19, 2026) ("We have implemented commercially reasonable technical, administrative, and physical security measures to protect the information that we collect or receive.").

between July 6 and July 10, 2026, and that files containing Private Information were accessed without authorization.[13]

36. On or about August 21, 2026, Defendants began sending individualized Notices in connection with the Data Breach. The Notice states as follows:[14]

> **What Happened**
> Similar to other financial services firms, Apollo recently experienced a social engineering incident. Upon detecting the incident, we promptly notified law enforcement, engaged leading outside cybersecurity and forensic experts, enhanced our security protocols, and launched an investigation. Based on our investigation, we determined that there was unauthorized access to certain cloud platforms between July 6 and July 10, 2026.
>
> **What Information Was Involved**
> During our investigation, we learned on August 12, 2026 that the information potentially impacted by this incident included your name, date of birth, contact information, home address, and your Social Security Number (SSN).[15]

37. To be clear, there are numerous issues with Defendants' Data Breach, but the deficiencies in the Data Breach Notice exacerbate the circumstances for victims of the Data Breach: (1) Defendants fail to state whether they were able to contain or end the cybersecurity threat, leaving victims to fear whether the Private Information that Defendants continue to maintain is secure; (2) Defendants fail to state how the Breach itself occurred; and (3) Defendants fail to state when they first discovered the Data Breach. All of this information is vital to victims of a data breach, let alone a data breach of this magnitude due to the sensitivity of information compromised in this specific breach.

38. Despite Defendants' intentional opacity about the root cause of this incident, several facts may be gleaned from the Notice, including: (1) that this Data Breach was the work of

---

[13] *See* Defendants' notice submitted to the California Office of the Attorney General, accessible at: https://oag.ca.gov/system/files/L01%20Template_CA.pdf (last visited Oct. 19, 2026).
[14] *Id.*
[15] *Id.*

cybercriminals; (2) that the cybercriminals first infiltrated Defendants' networks and systems, and downloaded data from the networks and systems (aka exfiltrated data, or in layperson's terms "stole" data); (3) that once inside Defendants' networks and systems, the cybercriminals targeted information including Plaintiffs' and Class Members' Private Information and other sensitive information for download and theft; and (4) that, by describing the intrusion as "[s]imilar to other financial services firms," Defendants effectively acknowledge that this Data Breach was part of a broader, coordinated attack on the financial services industry, which upon information and belief, was carried out by the data-theft organization known as UNC6671 as part of the "Cordial Spider Campaign."

39. Moreover, in their Notice, Defendants failed to specify whether they undertook any efforts to contact the Class Members whose data was accessed and acquired in the Data Breach to inquire whether any of the Class Members suffered misuse of their data, whether Class Members should report their misuse to Defendants, and whether Defendants set up any mechanism for Class Members to report any misuse of their data.

40. Making matters worse, the Data Breach was not the product of a sophisticated software exploit but of a basic social engineering scheme that reasonable security practices should have stopped. According to public reporting:

> "[t]he intrusion began not with a software exploit but with a phone call: attackers telephoned employees on their personal mobiles, impersonated internal IT helpdesk staff (in some cases spoofing Apollo's real helpdesk number), and directed them to fake login portals that captured passwords and multi-factor authentication (MFA) codes."[16]

[16] Divesh Mandhyan, *The Apollo Global Management Data Breach and the UNC6671/Cordial Spider Campaign*, iZOOlogic (Aug. 27, 2026), https://izoologic.com/threat-advisory/the-apollo-global-management-data-breach-and-the-unc6671-cordial-spider-campaign/ (last visited Oct. 19, 2026).

41. "The Apollo Global breach demonstrates that a financially motivated actor can achieve a significant personal-data compromise at a major financial institution with no malware and no exploit, using only a persuasive phone call, a lookalike portal and a stolen session."[17] Thus, the cybercriminals did not need to break into Defendants' systems; Defendants opened the door for them. By failing to train employees to recognize and resist basic social-engineering tactics, and by failing to put in place safeguards that would have stopped a phone call from compromising their systems, Defendants effectively handed Plaintiffs' and Class Members' Private Information to the attackers.

42. The Data Breach has been attributed to UNC6671, which is a data-theft extortion group whose recent campaign has focused on financial services, private equity, hedge funds, law firms and rating agencies.[18] This is particularly worrisome for Plaintiffs and Class Members because data stolen by UNC6671 "is staged and, for some victims, published on a brand-specific leak site after a 72 hour deadline."[19]

43. Thus, upon information and belief, Plaintiffs' and Class Members' Private Information was stolen by UNC6671 and has already been posted to the dark web.

44. Due to Defendants' inadequate security measures, there is no doubt that Plaintiffs and the Class Members now face a present, immediate, and ongoing risk of fraud and identity theft and must deal with that threat forever.

45. Upon information and belief, the Private Information was not encrypted prior to the Data Breach.

---

[17] *Id.*
[18] *Id.*
[19] *Id.*

46. Upon information and belief, the cyberattack was targeted at Defendants as a company that collects and maintains valuable personal data from many individuals, including Plaintiffs and Class Members.

47. Upon information and belief, the cyberattack was expressly designed to gain access to private and confidential data, including (among other things) the Private Information of Plaintiffs and Class Members.

48. Defendants had obligations to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

49. Plaintiffs and Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

50. Upon information and belief, Defendants made promises to Plaintiffs and Class Members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

51. Acknowledging the harm that the Data Breach presents, Defendants are offering victims two years of complimentary credit monitoring services – an offer that is inadequate considering that victims of the Data Breach will likely suffer an increased risk of identity theft and other harms for years into the future, if not for their respective lifetimes.[20]

***The Data Breach Was Foreseeable and Defendants Were Aware of Its Risk***

52. It is well known that Private Information, including Social Security numbers in particular, is an invaluable commodity and a frequent target of hackers.

---

[20] *Id.*

53. As a financial services provider in possession of thousands of customers' and employees' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members and of the foreseeable consequences they would suffer if Defendant's data security systems were breached. The Data Breach was particularly foreseeable because of the dramatic increase in frequency of data breaches targeting specifically financial services providers like Defendant.[21] According to the IMF, "cyber events in the financial sector have grown by tenfold and cyber-enabled fraud has nearly tripled in the past decade."[22] The following figure from the IMF illustrates that growth:




*Figure 1. Cyber Events in the Financial Sector, 2014-2023.*[23]

54. Indeed, according to the Identity Theft Resource Center the financial services industry was the most breached industry in the United States in 2025.[24] The financial services

---

[21] Hadley McIntosh, *Financial Services Cybersecurity Statistics for 2026: Breach Costs, Top Threats, and Third-Party Risk, Swif* (Aug. 4, 2026), https://www.swif.ai/blog/financial-services-cybersecurity-statistics (last visited Sept. 15, 2026).

[22] Tanai Khiaonarong & Shanyuan Zheng, *The Rise of Cyber Events and Digital Fraud in the Financial Sector, IMF Working Paper No. 2026/062* (Mar. 27, 2026), *available at* https://www.elibrary.imf.org/view/journals/001/2026/062/article-A001-en.xml (last visited Sept. 15, 2026).

[23] *Id.*

[24] Identity Theft Resource Center, *2025 Annual Data Breach Report* (Jan. 2026), *available at:* https://www.idtheftcenter.org/publication/2025-data-breach-report/ (last visited Sept. 15, 2026).

industry suffered 739 data compromises while the healthcare industry, the runner-up, only suffered 534.[25]

55. In 2025, the United States experienced an all-time record of 3,322 data breaches—a 79 percent increase over the prior five years.[26] Further, professional services, increased 162 percent over that same five-year period.[27] These widely publicized trends have placed Defendants on notice that financial services firms like itself were the primary targets of cybercriminals and that the threat was accelerating, not subsiding. Individuals place a high value not only on their Private Information, but also on the privacy of that data. For the individual, identity theft causes significant negative financial impact on victims as well as severe distress and other strong emotions and physical reactions.

56. Moreover, the risk of a social engineering attack was well known and reasonably foreseeable, and Defendants knew or should have known that they had to train their employees adequately to recognize and prevent such attacks. According to Verizon's 2024 Data Breach Investigations Report, 68% of breaches involved a human element, like an employee falling victim to a social engineering attack.[28]

57. Further, in light of recent high profile data breaches at other industry leading companies, including, T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), LoanDepot (16.9

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *2024 Data Breach Investigations Report,* at 8, Verizon (2024), https://www.verizon.com/business/resources/Te3/reports/2024-dbir-data-breach-investigations-report.pdf (last visited Oct. 19, 2026).

million affected, January 2024), Evolve Bank & Trust (7.6 million affected, May 2024), Financial Business and Consumer Solutions (4.2 million affected, February 2024), and Prudential Financial (2.5 million affected, February 2024), Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

58. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

59. Additionally, as companies became more dependent on computer systems to run their business, *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.

60. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

61. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' server(s), and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

62. Despite the prevalence of public announcements of data breach and data security compromises, and despite their own acknowledgment of their duties to keep the Private Information private and secure, Defendants failed to take appropriate steps to protect the Private Information of Plaintiffs and the proposed Class from being compromised.

***Defendants Could Have Prevented the Data Breach***

63. Data breaches are preventable.[29] "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[30] "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[31]

64. Most reported data breaches "are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[32]

65. Nowhere is this more true than here: by failing to train their employees to recognize and resist even basic social-engineering tactics, Defendants opened the door for UNC6671 to access its systems and ***steal*** Plaintiffs' and Class Members' Private Information.

66. The Federal Trade Commission ("FTC") has published guidelines that establish reasonable data security practices for businesses.[33]

67. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[34]

---

[29] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.

[30] *Id.* at 17.

[31] *Id.* at 28.

[32] *Id.*

[33] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf.

[34] *Id.*

68. The FTC guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.[35]

69. Specifically, the Cybersecurity & Infrastructure Security Agency ("CISA") recommends several measures to guard against social engineering attacks, the very tactic used to gain initial access to Defendants' systems in the Data Breach:

- Be suspicious of unsolicited phone calls, visits, or email messages from individuals asking about employees or other internal information. If an unknown individual claims to be from a legitimate organization, try to verify his or her identity directly with the company.
- Do not provide personal information or information about your organization, including its structure or networks, unless you are certain of a person's authority to have the information.
- Do not reveal personal or financial information in email, and do not respond to email solicitations for this information. This includes following links sent in email.
- Don't send sensitive information over the internet before checking a website's security.
    - Pay attention to the Uniform Resource Locator (URL) of a website. Look for URLs that begin with "https"—an indication that sites are secure—rather than "http."
    - Look for a closed padlock icon—a sign your information will be encrypted.

[35] *Id.*

- If you are unsure whether an email request is legitimate, try to verify it by contacting the company directly. Do not use contact information provided on a website connected to the request; instead, check previous statements for contact information.
- Install and maintain anti-virus software, firewalls, and email filters to reduce some of this traffic.
- Take advantage of any anti-phishing features offered by your email client and web browser.
- Enforce multifactor authentication (MFA).[36]

70. Upon information and belief, Defendants failed to implement and follow the above measures, which led to the infiltration of its systems and theft of Plaintiffs' and Class Members' Private Information.

71. Further, the FTC guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[37]

72. Upon information and belief, Defendants failed to implement reasonable and necessary industry-standard data security measures, including those recommended in the FTC's guidelines, as shown by the fact that, after breaching Defendants' systems, the data-theft

[36] *Avoid Social Engineering and Phishing Attacks*, Cybersecurity & Infrastructure Security Agency (Feb. 1, 2021), https://www.cisa.gov/news-events/news/avoiding-social-engineering-and-phishing-attacks (last visited Oct. 19, 2026).
[37] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf

organization had ***four (4) days of uninterrupted access*** (July 6, 2026 – July 10, 2026), during which it exfiltrated Plaintiffs' and Class Members' sensitive information.

73. Defendants were at all times fully aware of their obligation to protect the Private Information of consumers under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (“FTCA"), yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored, and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

74. Based on allowing their security certificates to lapse and upon information and belief, Defendants also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 800-53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in cybersecurity readiness.

75. As explained by the Federal Bureau of Investigation, “[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection.”[38]

76. To prevent and detect the attack here, Defendants could and should have taken, as recommended by the Federal Bureau of Investigation, the following measures:

[38] *See How to Protect Your Networks from RANSOMWARE*, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Implemented an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enabled strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scanned all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configured firewalls to block access to known malicious IP addresses.
- Patched operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Managed the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configured access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disabled macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implemented Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Considered disabling Remote Desktop protocol (RDP) if it is not being used.
- Used application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Executed operating system environments or specific programs in a virtualized environment.
- Categorized data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[39]

77. Upon information and belief, Defendants failed to do any of the above.

78. To prevent and detect cyberattacks, Defendants could and should have recommended that their employees, as recommended by the United States Cybersecurity & Infrastructure Security Agency, take the following measures:

---

[39] *Id.* at 3–4.

- **Updated and patched your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks.
- **Used caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net).
- **Opened email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.
- **Kept your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it.
- **Verified email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.
- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about

known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Used and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[40]

79. In addition, to prevent and detect the Data Breach Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Harden internet-facing assets**
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audits
- **Thoroughly investigate and remediate alerts.**
  - Prioritize and treat commodity malware infections as potential full compromise of the system
- **Include IT professionals in security discussions.**
  - Ensure collaboration among security operations, security administrators, and information technology administrators to configure servers and other endpoints securely

[40] *See Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (revised Sept. 2, 2021), https://www.cisa.gov/news-events/news/protecting-against-ransomware (internal citations omitted).

- **Build and maintain credential hygiene**
  - Use multifactor authentication or network level authentication and enforce strong, randomized, just-in-time local administrator passwords
- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events
- **Harden infrastructure**
  - Utilize Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and Antimalware Scan Interface for Office Visual Basic for Applications[41]

80. Specifically, among other failures, Defendants had far too much confidential unencrypted information held on their systems, which was easily accessible for a data-theft group utilizing even the most basic social engineering tactics. Such Private Information should have been segregated into an encrypted system.[42]

[41] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT THREAT INTELLIGENCE (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[42] *See* Adnan Raja, *How to Safeguard Your Business Data With Encryption*, DATAINSIDER (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

81. Moreover, it is well-established industry standard practice for a business to dispose of confidential Private Information once it is no longer needed.[43]

82. The FTC has repeatedly emphasized the importance of disposing of unnecessary Private Information: "Keep sensitive data in your system only as long as you have a business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system, it can't be stolen by hackers." Rather than following this basic standard of care, Defendants kept thousands of individuals' unencrypted Private Information on their inadequately secured systems indefinitely.

83. In sum, the Data Breach could have been easily prevented through standard practices like adequate employee training, the use of industry standard network segmentation, redaction, and encryption of all Private Information—which Defendants negligently failed to do.

84. Further, the scope of the Data Breach could have been dramatically reduced had Defendants utilized proper record retention and destruction practices—but Defendants negligently did no such thing.

***Defendants Had a Duty to Plaintiffs and Class Members to Secure Private Information***

85. At all relevant times, Defendants had a duty to Plaintiffs and Class Members to properly secure their Private Information, encrypt and maintain such information using industry standard methods, ***train their employees***, utilize available technology to defend their systems from invasion, act reasonably to prevent foreseeable harm to Plaintiffs and Class Members, and to *promptly* notify Plaintiffs and Class Members when Defendants became aware that their Private Information may have been compromised.

[43] *See Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

86. Defendants' duty to use reasonable security measures arose as a result of the special relationship that existed between Defendants, on the one hand, and Plaintiffs and the Class Members, on the other hand. The special relationship arose because Plaintiffs and the Members of the Class relied on Defendants to secure their Private Information when they entrusted Defendants with their Private Information.

87. Defendants had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite their obligation to protect such information. Indeed, Defendants' assets under management reached $1.05 trillion in 2026.[44] Despite these resources, Defendants pushed data security aside and failed to train their employees to recognize and stop even a simple phone-based social-engineering attack. Accordingly, Defendants breached their common law, statutory, and other duties owed to Plaintiffs and Class Members.

88. Security standards commonly accepted among businesses that store Private Information using the internet include, without limitation:

a. Maintaining a secure firewall configuration;

b. Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

c. Monitoring for suspicious or irregular traffic to servers;

d. Monitoring for suspicious credentials used to access servers;

e. Monitoring for suspicious or irregular activity by known users;

f. Monitoring for suspicious or unknown users;

g. Monitoring for suspicious or irregular server requests;

---

[44] Maham Fatima, *Hackers Breach Apollo Global (APO) Right as Assets Hit $1 Trillion*, Yahoo (Aug. 24, 2026) https://finance.yahoo.com/markets/stocks/articles/hackers-breach-apollo-global-apo-113803588.html (last visited Oct. 19, 2026).

h. Monitoring for server requests for Private Information;

i. Monitoring for server requests from VPNs; and

j. Monitoring for server requests from Tor exit nodes.

89. The ramifications of Defendants' failure to keep Private Information secure are long lasting and severe. Once Private Information is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims is likely to continue for years.

***The Value of Personally Identifiable Information***

90. The Private Information of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, [45] and bank details can have a price range of $30 to over $4,000.[46]

91. As a growing number of federal courts have begun to recognize the loss of value of Private Information as a viable damages theory, the sale of Private Information from data breaches, as in the Data Breach alleged herein, is particularly harmful to data breach victims – especially when it takes place on the dark web.

92. The dark net is an unindexed layer of the internet that requires special software or authentication to access.[47] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on

---

[45] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 19, 2026).

[46] https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 19, 2026).

[47] *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Oct. 19, 2026).

the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[48] This prevents dark web marketplaces from being easily identifiable to authorities or those not in the know.

93. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, sensitive personal information like the Private Information at issue here. The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth and other personal information.[49]

94. Plaintiffs' and Class Members' Private Information is a valuable commodity, a market exists for Plaintiffs' and Class Members' Private Information (which is why the Data Breach was perpetrated in the first place), and Plaintiffs' and Class Members' Private Information is likely being sold by hackers on the dark web (as that is the *modus operandi* of data thieves) – as a result, Plaintiffs and Class Members have lost the value of their Private Information, which is sufficient to plausibly allege injury arising from a data breach.

95. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[50] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data

---

[48] *Id.*

[49] *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Oct. 19, 2026).

[50] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Oct. 19, 2026).

broker who in turn aggregates the information and provides it to marketers or app developers.[51] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[52]

96. The Private Information stolen in this specific Data Breach was particularly harmful.

97. Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular personal privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including: 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts," and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft; and 5) Utility Fraud.

98. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised in the Data Breach, are among the worst kinds of private information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

99. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information

[51] https://datacoup.com/ (last visited Oct. 19, 2026).
[52] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Oct. 19, 2026).

increases."[53] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[54]

100. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[55]

101. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[56] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[57]

102. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[53] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm (last visited Oct. 19, 2026)
[54] *Id.*
[55] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Oct. 19, 2026)
[56] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited Oct. 19, 2026)
[57] *See* https://www.investopedia.com/terms/s/ssn.asp (last visited Oct. 19, 2026)

103. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[58]

104. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols*., No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiffs' Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks.").

105. Private Information can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an

---

[58] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Oct. 19, 2026)

individual, such as their birthdate, birthplace, and mother's maiden name.[59]

106. Given the nature of Defendants' Data Breach, as well as the unreasonable delay in notification to Class Members, it is foreseeable that the compromised Private Information has been or will be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiffs' and Class Members' Private Information can easily obtain Plaintiffs' and Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

107. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures.

***The Harm Caused by the Data Breach Now and Going Forward***

108. Victims of data breaches are susceptible to becoming victims of identity theft for years to come. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2(a).

109. The type of data that was stolen in the Data Breach can be used to perpetrate fraud and identity theft and Plaintiffs and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach.

110. When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web, where malicious actors buy and sell that information for profit.[60]

---

[59] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1.

[60] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Dec. 28, 2020) https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited Oct. 19, 2026).

111. For example, when the U.S. Department of Justice announced its seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity.[61] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [Private Information] belonging to victims from countries all over the world."[62]

112. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft-related crimes discussed below.

113. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

114. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches can

---

[61] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018) https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited Oct. 19, 2026).

[62] *Id.*

be the starting point for these additional targeted attacks on the victim.

115. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[63]

116. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

117. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information, such as emails, phone numbers, or credit card numbers, may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

---

[63] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.(last visited Oct. 19, 2026).

118. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

119. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

120. These efforts are consistent with the U.S. Government Accountability Office, which released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[64]

121. These efforts are also consistent with the steps that the FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on

---

[64] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf. (last visited Oct. 19, 2026).

their credit, and correcting their credit reports.[65]

***Diminution of Value of Private Information***

122. Private Information is a valuable property right.[66] The value is axiomatic, considering the value of Big Data in corporate America, and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond a doubt that Private Information has considerable market value.

123. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

124. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

125. As a result of the Data Breach, the Private Information of Plaintiffs and Class Members has been exposed to criminals for misuse. The injuries suffered by Plaintiffs and Class

[65] *See* Federal Trade Commission, *IdentityTheft.gov*, https://www.identitytheft.gov/Steps. (last visited Oct. 19, 2026).

[66] *See, e.g.*, Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

Members, or likely to be suffered as a direct result of Defendants' Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) invasion of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damage to and diminution in value of their personal data entrusted to Defendants with the mutual understanding that Defendants would safeguard their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (h) the continued risk to their Private Information, which remains in the possession of Defendants, and which is subject to further injurious breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

***Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

126. In addition to a remedy for economic harm, Plaintiffs and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

127. Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes.

128. Such fraud may go undetected for years; consequently, Plaintiffs and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

129. As a result, Plaintiffs and Class Members also request relief in the form of the future cost of credit and identity theft monitoring, which is reasonable and necessary. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach.

***Loss of the Benefit of the Bargain***

130. Furthermore, Defendants' poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to provide their Private Information to Defendants, Plaintiffs and other reasonable consumers understood and expected that in exchange, Defendants would implement necessary data security to protect the Private Information, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

***Plaintiffs' Experiences and Injuries***

<u>Plaintiff Henggao Cai's Experiences</u>

131. Plaintiff Cai is a shareholder of Defendants and provided his Private Information to Defendants in connection with becoming a shareholder of Defendants.

132. Upon information and belief, Defendants maintained Plaintiff Cai's Private Information in their network and systems before, during, and after the Data Breach. Accordingly, Plaintiff Cai is a victim of the Data Breach.

133. To date, Defendants have done next to nothing to adequately protect Plaintiff Cai and Class Members, or to compensate them for their injuries sustained in this Data Breach, particularly given the fact that Plaintiff Cai's Private Information has already been "impacted" in the Data Breach and likely been made available on the dark web to anyone wishing to purchase it.

134. Nor have Defendants compensated Plaintiff Cai and Class Members for the time they will spend monitoring their accounts, placing credit freezes and fraud alerts, changing online passwords and other actions.

135. Plaintiff Cai and Class Members have been further damaged by the compromise of their Private Information in the Data Breach which was "impacted" and is in the hands of cybercriminals who illegally accessed Defendants' network for the specific purpose of targeting the Private Information.

136. Plaintiff Cai typically takes measures to protect his Private Information and is very careful about sharing his Private Information. Plaintiff Cai has never knowingly transmitted unencrypted Private Information over the internet or other unsecured source.

137. Plaintiff Cai stores any documents containing his Private Information in a safe and secure location, and he diligently chooses unique usernames and passwords for his online accounts.

138. As a result of the Data Breach, Plaintiff Cai has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. In response to the Data Breach, Plaintiff Cai has spent time monitoring his accounts and credit score, changing his online account passwords, and verifying the legitimacy of the Data Breach. This is time that was lost and unproductive and took away from other activities and duties.

139. Plaintiff Cai also suffered actual injury in the form of damages to and diminution in the value of his Private Information — a form of intangible property that he entrusted to

Defendants, which was compromised in and as a result of the Data Breach.

140. Plaintiff Cai suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

141. Plaintiff Cai suffered emotional distress and increased stress and anxiety as a result of the Data Breach because of the actions he has been forced to undertake, the loss of control over his most intimate information, and the fact that he must remain vigilant for the remainder of his life.

142. Plaintiff Cai has suffered imminent and impending injury arising from the increased risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

143. Defendants obtained and continue to maintain Plaintiff Cai's Private Information and have a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure. Defendants acquired Plaintiff Cai's Private Information. Plaintiff Cai, however, would not have entrusted his Private Information to Defendants had he known that they would fail to maintain adequate data security. Plaintiff Cai's Private Information was compromised and disclosed as a result of the Data Breach.

144. As a result of the Data Breach, Plaintiff Cai anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Cai is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

<u>Plaintiff Donna Paris' Experiences</u>

145. Plaintiff Paris is a shareholder of Defendants and provided her Private Information to Defendants in connection with becoming a shareholder of Defendants.

146. Upon information and belief, Defendants maintained Plaintiff Paris's Private Information in their network and systems before, during, and after the Data Breach. Accordingly, Plaintiff Paris is a victim of the Data Breach.

147. To date, Defendants have done next to nothing to adequately protect Plaintiff Paris and Class Members, or to compensate them for their injuries sustained in this Data Breach particularly given the fact that Plaintiff Paris's Private Information has already been "impacted" in the Data Breach and likely been made available on the dark web to anyone wishing to purchase it.

148. Nor have Defendants compensated Plaintiff Paris and Class Members for the time they will spend monitoring their accounts, placing credit freezes and fraud alerts, changing online passwords and other actions.

149. Plaintiff Paris and Class Members have been further damaged by the compromise of their Private Information in the Data Breach which was "impacted" and is in the hands of cybercriminals who illegally accessed Defendants' network for the specific purpose of targeting the Private Information.

150. Plaintiff Paris typically takes measures to protect her Private Information and is very careful about sharing her Private Information. Plaintiff Paris has never knowingly transmitted unencrypted Private Information over the internet or other unsecured source.

151. Plaintiff Paris stores any documents containing her Private Information in a safe and secure location, and she diligently chooses unique usernames and passwords for her online accounts.

152. As a result of the Data Breach, Plaintiff Paris has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach.

In response to the Data Breach, Plaintiff Paris has spent time monitoring her accounts and credit score, changing her online account passwords, and verifying the legitimacy of the Data Breach. This is time that was lost and unproductive and took away from other activities and duties.

153. Plaintiff Paris also suffered actual injury in the form of damages to and diminution in the value of her Private Information — a form of intangible property that she entrusted to Defendants, which was compromised in and as a result of the Data Breach.

154. Plaintiff Paris suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

155. Plaintiff Paris suffered emotional distress and increased stress and anxiety as a result of the Data Breach because of the actions she has been forced to undertake, the loss of control over her most intimate information, and the fact that she must remain vigilant for the remainder of her life.

156. Plaintiff Paris has suffered imminent and impending injury arising from the increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of criminals.

157. Defendants obtained and continue to maintain Plaintiff Paris's Private Information and have a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure. Defendants acquired Plaintiff Paris's Private Information. Plaintiff Paris, however, would not have entrusted her Private Information to Defendants had she known that they would fail to maintain adequate data security. Plaintiff Paris's Private Information was compromised and disclosed as a result of the Data Breach.

158. As a result of the Data Breach, Plaintiff Paris anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data

Breach. As a result of the Data Breach, Plaintiff Paris is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

Plaintiff Tiffany Farrugia's Experiences

159. Plaintiff Farrugia is a former employee of Defendant AMH and provided her Private Information to Defendants in connection with her employment with Defendant AMH.

160. Upon information and belief, Defendants maintained Plaintiff Farrugia's Private Information in their network and systems before, during, and after the Data Breach. Accordingly, Plaintiff Farrugia is a victim of the Data Breach.

161. To date, Defendants have done next to nothing to adequately protect Plaintiff Farrugia and Class Members, or to compensate them for their injuries sustained in this Data Breach, particularly given the fact that Plaintiff Farrugia's Private Information has already been stolen in the Data Breach and likely been made available on the dark web to anyone wishing to purchase it.

162. Nor have Defendants compensated Plaintiff Farrugia and Class Members for the time they will spend monitoring their accounts, placing credit freezes and fraud alerts, changing online passwords and other actions.

163. Plaintiff Farrugia and Class Members have been further damaged by the compromise of their Private Information in the Data Breach which was "impacted" and is in the hands of cybercriminals who illegally accessed Defendants' network for the specific purpose of targeting the Private Information.

164. Plaintiff Farrugia typically takes measures to protect her Private Information and is very careful about sharing her Private Information. Plaintiff Farrugia has never knowingly transmitted unencrypted Private Information over the internet or other unsecured source.

165. Plaintiff Farrugia stores any documents containing her Private Information in a safe and secure location, and she diligently chooses unique usernames and passwords for her online accounts.

166. As a result of the Data Breach, Plaintiff Farrugia has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. In response to the Data Breach, Plaintiff Farrugia has spent time monitoring her accounts and credit score, changing her online account passwords, and verifying the legitimacy of the Data Breach. This is time that was lost and unproductive and took away from other activities and duties.

167. Plaintiff Farrugia also suffered actual injury in the form of damages to and diminution in the value of her Private Information — a form of intangible property that she entrusted to Defendants, which was stolen in and as a result of the Data Breach.

168. Plaintiff Farrugia suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

169. Plaintiff Farrugia suffered emotional distress and increased stress and anxiety as a result of the Data Breach because of the actions she has been forced to undertake, the loss of control over her most intimate information, and the fact that she must remain vigilant for the remainder of her life.

170. Plaintiff Farrugia has suffered imminent and impending injury arising from the increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of criminals.

171. Defendants obtained and continue to maintain Plaintiff Farrugia's Private Information and have a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure. Plaintiff Farrugia, however, would not have entrusted

her Private Information to Defendants had she known that they would fail to maintain adequate data security. Plaintiff Farrugia's Private Information was stolen as a result of the Data Breach.

172. As a result of the Data Breach, Plaintiff Farrugia anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Farrugia is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V. CLASS ACTION ALLEGATIONS

173. Plaintiffs bring this nationwide class action individually and on behalf of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b) on behalf of a nationwide class defined as:

> All individuals residing in the United States whose Private Information may have been compromised in the Data Breach (the "Class").

174. Excluded from the Class are Defendants' officers and directors, and any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

175. Plaintiffs hereby reserve the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

176. **Numerosity**. The members of the Class are so numerous that joinder of all of them is impracticable. Upon information and belief, the Class is comprised of at least thousands of individuals.

177. **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common

questions of law and fact include, without limitation:

a. Whether Defendants unlawfully used, maintained, or disclosed Private Information;

b. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendants owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendants breached their duty to Class Members to safeguard their Private Information;

g. Whether an unauthorized actor obtained Class Members' Private Information in the Data Breach;

h. Whether the stolen Private Information has been published on the dark web;

i. Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

j. Whether Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

k. Whether Defendants' conduct was negligent;

l. Whether Defendants breached implied contracts for adequate data security with Class Members;

m. Whether Defendants were unjustly enriched by retention of the monetary benefits conferred on them by Class Members; and

n. Whether Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

178. **Typicality**. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

179. **Adequacy of Representation**. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

180. **Predominance**. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

181. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual

Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial and party resources, and protects the rights of each Class Member.

182. Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and declaratory relief are appropriate on a class-wide basis.

183. Likewise, particular issues are appropriate for certification pursuant to Federal Rule of Civil Procedure 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

a. Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

c. Whether Defendants failed to take commercially reasonable steps to safeguard Private Information; and

d. Whether adherence to FTC data security requirements and/or industry standard data security measures would have reasonably prevented the Data Breach.

184. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified by Defendants.

## VI. CAUSES OF ACTION

**COUNT I**
**NEGLIGENCE/NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class)**

185. Plaintiffs hereby repeat and reallege paragraphs 1 through 184 of this Complaint and incorporate them by reference herein.

186. Defendants knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information for pecuniary gain, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

187. Defendants had a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' Private Information.

188. Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed. The harm that Plaintiffs and Class Members experienced was within the zone of foreseeable harm known to Defendants.

189. Defendants' duty to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendants with their confidential Private Information, a mandatory step in obtaining services from, becoming a shareholder of, and/or obtaining employment with Defendants. While this special relationship exists independent from any contract, it is recognized by Defendants' privacy practices, as well as applicable laws and regulations. Specifically, Defendants actively solicited and gathered Private Information as part of their business and as employers, and were solely responsible for and in the position to ensure that

their systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a resulting data breach.

190. Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiffs and the Class, to maintain adequate data security.

191. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices and the frequency of data breaches and social engineering attacks in general.

192. Defendants also had a common law duty to prevent foreseeable harm to others. Plaintiffs and the Class were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class, the critical importance of adequately safeguarding that Private Information, and the necessity of encrypting Private Information stored on Defendants' systems. It was foreseeable that Plaintiffs and Class Members would be harmed by the failure to protect their personal information because hackers are known to routinely attempt to steal such information and use it for nefarious purposes.

193. Defendants' conduct created a foreseeable risk of harm to Plaintiffs and the Class. Defendants' wrongful conduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendants' misconduct also included their decision not to comply with industry standards for the safekeeping of Plaintiffs' and the Class's Private Information, including basic measures to prevent a social engineering attack.

194. Plaintiffs and the Class had and have no ability to protect their Private Information that was in, and remains in, Defendants' possession.

195. Defendants were in a position to effectively protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

196. By assuming the responsibility to collect and store this data for business and employment purposes, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes by which they could prevent a social engineering attack, detect a breach of their security systems in a reasonably expeditious period of time, and to give prompt notice to those affected in the case of a data breach.

197. Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within Defendants' possession.

198. Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiffs' and Class Members' Private Information.

199. Defendants, through their actions and/or omissions, unlawfully breached their duty to timely disclose to Plaintiffs and Class Members that the Private Information within Defendants' possession might have been compromised and precisely the type of information compromised.

200. Defendants' breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised.

201. Pursuant to Section 5 of the FTCA, Defendants had a separate and independent duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

202. The FTCA is intended, in part, to protect individuals whose Private Information is maintained by another and who are unable to safeguard their information as they cannot exercise control or direction over the data security practices.

203. Plaintiffs and the members of the Class are within the class of persons that the FTCA was intended to protect as their Private Information was collected and maintained by Defendants and they were unable to exercise control over Defendants' data security practices.

204. The harm that occurred as a result of the Data Breach is the type of harm the FTCA was intended to guard against.

205. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the members of the Class.

206. Defendants breached their duties to Plaintiffs and the members of the Class under the Federal Trade Commission Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

207. Had Plaintiffs and the members of the Class known that Defendants would not adequately protect their Private Information, Plaintiffs and the members of the Class would not have entrusted Defendants with their Private Information.

208. Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se*.

209. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and the members of the Class, they would not have been injured.

210. The injury and harm suffered by Plaintiffs and the members of the Class was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiffs and the members of the Class to experience the foreseeable harms associated with the exposure of their Private Information.

211. As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information by the data-theft organization "UNC6671"; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information for Plaintiffs' and Class Members' respective lifetimes; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and other identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession; and (viii) present and future costs in the form of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the compromise

of Private Information as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class Members.

212. As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

213. Additionally, as a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession.

214. As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiffs and the Class are now at an increased risk of identity theft or fraud.

215. As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiffs are entitled to and demand actual, consequential, and nominal damages and injunctive relief to be determined at trial.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

216. Plaintiffs hereby repeat and reallege paragraphs 1 through 184 of this Complaint and incorporate them by reference herein.

217. Plaintiffs and the Class entrusted their Private Information to Defendants in connection with the services Defendants provide and/or as a condition of obtaining employment with Defendants. In so doing, Plaintiffs and the Class entered into implied contracts with

Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

218. At the time Defendants acquired the Private Information of Plaintiffs and the Class, there was a meeting of the minds and a mutual understanding that Defendants would safeguard the Private Information and not take unjustified risks when storing the Private Information.

219. Implicit in the agreements between Plaintiffs and Class Members and Defendants to provide Private Information was the latter's obligation to: (a) use such Private Information for business and employment purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses, and (f) retain the Private Information only under conditions that kept such information secure and confidential.

220. Plaintiffs and the Class would not have entrusted their Private Information to Defendants had they known that Defendants would fail to implement basic data security measures to prevent a social engineering attack, make the Private Information internet-accessible, not encrypt sensitive data elements, and not delete the Private Information when Defendants no longer had a reasonable need to maintain it.

221. Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendants.

222. Defendants breached the implied contracts they made with Plaintiffs and the Class by failing to safeguard and protect their personal information, by failing to provide timely and accurate notice to them that personal information was compromised as a result of the Data Breach.

223. As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiffs and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the publication and illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

224. As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages to be determined at trial.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

225. Plaintiffs hereby repeat and reallege paragraphs 1 through 184 of this Complaint and incorporate them by reference herein.

226. This Count is brought in the alternative to Count II, Breach of Implied Contract.

227. Plaintiffs and Class Members conferred a monetary benefit on Defendants by providing Defendants with their valuable Private Information, labor, and/or money in connection with their dealings with Defendants. In so conferring this benefit, Plaintiffs and Class Members

understood that part of the benefit Defendants derived from the Private Information, labor, and or money provided to them by Plaintiffs would be applied to data security efforts to safeguard the Private Information.

228. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

229. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

230. Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiffs and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

231. Defendants acquired the monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

232. If Plaintiffs and Class Members knew that Defendants had not secured their Private Information, they would not have agreed to provide their Private Information to Defendants.

233. Plaintiffs and Class Members have no adequate remedy at law.

234. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise,

publication, and/or theft of their Private Information by the data-theft organization "UNC6671"; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

235. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

236. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

**COUNT IV**
**DECLARATORY JUDGMENT**
(On Behalf of Plaintiffs and the Class)

237. Plaintiffs hereby repeat and reallege paragraphs 1 through 184 of this Complaint and incorporate them by reference herein.

238. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described in this Complaint.

239. Defendants owe a duty of care to Plaintiffs and Class Members, which required it to adequately secure Plaintiffs' and Class Members' Private Information.

240. Defendants still possess Private Information belonging to Plaintiffs and Class Members.

241. Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

242. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owes a legal duty to secure Plaintiffs' and Class Members' Private Information and to timely notify them of a data breach under the common law and Section 5 of the FTCA;

b. Defendants' existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect Plaintiffs' and Class Members' Private Information; and

c. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Plaintiffs' and Class Members' Private Information.

243. This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect Plaintiffs' and Class Members' Private Information, including the following:

a. Order Defendants' to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b. Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

i. implement mandatory employee training designed to prevent social engineering attacks;

ii. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

iii. engaging third-party security auditors and internal personnel to run automated security monitoring;

iv. auditing, testing, and training its security personnel regarding any new or modified procedures;

v. segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

vi. conducting regular database scanning and security checks;

vii. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

viii. meaningfully educating its users about the threats they face with regard to the security of their Private Information, as well as the steps Plaintiffs' and Class Members' should take to protect themselves.

244. If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Defendants. The risk of another such breach is real, immediate, and substantial. If another breach at Defendants occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

245. The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Plaintiffs will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

246. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Defendants, thus preventing future injury to Plaintiffs and other customers and employees whose Private Information would be further compromised.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class defined herein, pray for judgment as against Defendants as follows:

a.) For an Order certifying this action as a Class action and appointing Plaintiffs and their counsel to represent the Class;

b.) For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c.) For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d.) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

e.) Ordering Defendants to pay for lifetime credit monitoring services for Plaintiffs and the Class;

f.) For an award of actual damages, compensatory damages, statutory damages and statutory penalties, in an amount to be determined, as allowable by law;

g.) For an award of punitive damages, as allowable by law;

h.) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i.) Pre- and post-judgment interest on any amounts awarded and,

j.) All such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED: October 19, 2026

Respectfully submitted,

*/s/ Leanna A, Loginov*
Leanna A. Loginov (NY 5894753)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Tel: 305-479-2299
lloginov@shamisgentile.com

Courtney Maccarone (NY 5030150)
**KOPELOWITZ OSTROW P.A.**
One W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
maccarone@kolawyers.com

Tyler J. Bean*
Tanner R. Hilton*
**SIRI & GLIMSTAD LLP**
101 Park Avenue Suite 1300, #16982799 Oklahoma City, OK 73102
Tel: (212) 532-1091
E: tbean@sirillp.com
E: thilton@sirillp.com

*Attorneys for Plaintiffs and the Class*

* *pro hac vice forthcoming*

## CERTIFICATE OF SERVICE

I, Leanna A. Loginov, hereby certify that on October 19, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record, below, via the ECF system.

By: */s/ Leanna A. Loginov*
Leanna A. Loginov